TUCKER, Judge.
Plaintiff, Willie J. Brooks, brought this suit against the defendant, Louisiana and Southern Life Insurance Company, under its policy of insurance in the principal amount of SIX THOUSAND AND NO/100 (|6,000.00) DOLLARS issued to Dyressie Brooks McBeth on April 1, 1967. Mrs. McBeth, the insured, met her demise on September 2, 1967 as the result of six gunshot wounds from a .22 caliber revolver. The plaintiff sues in his capacity as administrator of the insured’s estate and as tutor of the four minor children of deceased.
Defendant denied liability on the policy, affirmatively averring that the deceased had committed suicide. The policy contains a clause limiting the company’s liability in the case of suicide within two years from its date of issuance to the return of the amount of the premiums paid. Tender of the sum of $14.99 by the defendant’s draft was made, apparently the only semiannual premium paid by the insured on the policy, and this remittance was incorporated in the record.
Defendant has taken an appeal from the lower court’s judgment against it, and the plaintiff has answered the appeal, praying that the judgment in his favor be amended to provide for penalties in the amount of six (6%) per cent pursuant to the provisions of LSA-R.S. 22:656.
On appeal the defendant alleges as the ground for the reversal of the judgment that the trial court committed manifest error in its failure to find that the deceased died from self-inflicted gunshot wounds.
The issues to be determined are (1) was the insured a victim of suicide and (2) if Mrs. McBeth is adjudged not to have been a suicide, should penalties be assessed against defendant for arbitrary refusal to pay the amount of its policy ?
It is the established jurisprudence of this state that, where a defense of suicide is interposed by an insurance company to a suit on a life insurance policy, the insurer must establish the suicide to the exclusion of every other reasonable hypothesis. See Young v. First National Life Insurance Company, 159 So.2d 395 (La.App. *272 2d Cir. 1963) and the cases cited therein—Webster v. New York Life Insurance Co., 160 La. 854, 107 So. 599 (1926); Bayles v. Jefferson Standard Life Insurance Co., 148 So. 465, (La.App.3d 1933) and Oubre v. Mutual Life Insurance Company, 21 So.2d 191, (La.App. 4th Cir. 1945). In the Young and Oubre cases, supra, the courts seem to use the terms of “preponderance of evidence” and “exclusion of every other reasonable hypothesis” interchangeably.
See also Newdigate v. Acacia Mutual Life Assoc. of Wash., D. C., 180 La. 979, 158 So. 358, 362 (1935) holding that “While the law places upon the insurance company the burden of proving that the deceased committed suicide ‘to the exclusion of every other reasonable hypothesis’ of death by any other means, it is not required to offer proof sufficient to eliminate every speculative, fantastic, conjectural, frivolous, and imaginative hypothesis of death in any other way.”
Applying these guidelines the report of Dr. Stafford, the coroner, shows that six bullets struck the insured’s body, five of which entered the precardial region of the deceased’s upper left chest and one of which struck her upper left shoulder. An autopsy was performed by Dr. Stafford at the Bogalusa Charity Hospital and it was demonstrated that all of the bullets exited Mrs. McBeth’s back, with exception of the bullet causing the shoulder wound which still remained in her back. Five of the spent cartridges were recovered in various points throughout the room where the body was found, one in her body, and one of the bullets was not recovered. It was conjectured that it might have gone through a window pane. The investigation of the police into the particulars and possible cause or causes of the violent death of Mrs. McBeth was at best haphazard, and left much to be desired in reaching any logical or reasonable conclusion concerning the circumstances surrounding Mrs. McBeth’s death. No fingerprints were taken of the gun lying on deceased’s chest and no explanation was offered to justify this omission, and no ballistic tests were performed on the gun, thought to have been the death weapon, nor was any effort made to match the cartridges with the .22 caliber pistol which was handed to the police or with any other pistol or weapon. The actual cause of death was attributed to the hemorrhage in the left lung from the five bullets which went through it. Dr. Stafford estimated that the death occurred fifteen or twenty minutes after the last shot was fired.
Some confusion, of no great importance, arose from the testimony of a police officer and the coroner. Officer Jones said when he arrived at Mrs. McBeth’s house that he could feel her pulse, and, he, therefore, had her removed to the hospital. Dr. Stafford said Mrs. McBeth was dead when he arrived and made his examination, though her body was still warm.
The coroner came to the bizarre conclusion from his examination that the wounds were self-inflicted, stating that he based his opinion on the direction of the bullets and the assumption that she was a right-handed person, which would result in bullets fired by the deceased being directed usually more to her left side. He also based his conclusion of suicide on the proximity of the gun to her body when the shots were fired, as indicated by the powder burns surrounding three of the wounds, although there were no powder burns on the other three wounds. No proof was offered with respect to powder burns being found on either hand of deceased. There is no evidence adduced with respect to whether or not Mrs. McBeth was right-handed. In the further development of the method or means by which Dr. Stafford reached the conclusion Mrs. McBeth was a suicide victim, note his testimony commencing on Tr. 54, as follows:
“Q. Putting this case out of your mind and assume that you walked out of here and you found a corpse in this condition and these six shots and the medical findings *273 which you have related, would you conclude that that person died as a result of suicide ?
A. I think I would, yes.
Q. Simply based on what you have related ?
A. The proximity of the shots and the direction of the shots. I don’t believe that if somebody else had shot her, they would have been shooting at that angle. I think they would have shot more direct.
Q. Assume, Dr. Stafford, that Mr. Brooks is sitting right here from me, or standing, and that I point a gun at him and start shooting, then get the gun up close to him and shoot three more times. Now, wouldn’t the physical findings that you have related be present in Mr. Brooks’s case?
A. Could be, yes.”
Under additional questioning this physician admitted that in his fifty years of medical practice that he had never known anyone to commit suicide by more than two self-inflicted bullet wounds. He conceded that any chest wound similar to those created by the five shots which penetrated the chest wall of Mrs. McBeth, passed through the left lung of the deceased, and exited from her back, is very painful. When asked on cross-examination if it were possible for a lady to have shot herself six times with a revolver which requires the pulling of the trigger every time the hammer is tripped he lamely and nebulously replied that it was “medically possible”. Defense counsel then asked him this question: “I heard a physician testify once, Doctor, that in medicine anything is possible. Do you concur with that”, to which he answered: “Well, I guess so”.
In the course of the investigation the police upon their arrival at the scene were handed the .22 caliber pistol by an acquaintance of the deceased, a Mrs. Elvie Carnegie. This witness was the sister-in-law of Mr. Carnegie, who had visited Mrs. McBeth in her home about one hour before her death, and at the request of Mrs. McBeth this man, referred to in the testimony as an erstwhile paramour of the deceased, had been requested by Mrs. McBeth to take her children shopping for school supplies. Sometime while the shopping expedition was in progress and before Mr. Carnegie’s return of the children to their home, Mrs. McBeth’s death occurred. The evidence shows that the gun was found lying on Mrs. McBeth's chest or stomach with right hand on the pistol or lying beside her.
Police investigation showed that pistol had nine chambers, six of which were empty and three of which held unspent cartridges. This revolver was identified as belonging to the deceased, and the plaintiff, her brother Willie J. Brooks, who had taught her to use it, recalled that Mrs. McBeth had always experienced trouble in firing the gun. A box of .22 caliber bullets was found by a policeman under the cushion of a chair in the same room where insured was shot. Nine cartridges were missing from this box.
The paraffin tests, indicating the absence of powderburns on deceased’s hands, constitute persuasive evidence but this court holds that the evidence as provided by such tests support and corroborate the other evidence adduced here.
On defendant’s contention that Mrs. McBeth was a suicide, the evidence elicited by defendant in support of this position falls far short of the heavy burden resting on it in eliminating any other reasonable hypothesis before the acceptance of suicide as the cause of death. In this vein *274 the insured was described as a loner, sick and despondent. On the other hand she had no debts, an adequate income, known to have been not less than $400.00 per month. She loved her children and took good care of them. (Tr. 47-48). On'the day of the afternoon when she died she manifested a normal concern about her children’s school supplies. (Tr. 87, 91, 94). Nothing in the record indicates that Mrs. McBeth was overly upset, distraught or under weighty pressures.
The defendant in no wise has discharged the considerable burden resting on it to establish suicide in order to be relieved of liability under the policy. In short, the death of the insured was patently no accident, and the suggestion that the dead woman was able and did shoot herself six times does disservice to a rational approach to determining the cause of her death. The record clearly points the finger to several individuals, who within the realm of reason could have plausibly been interested in accomplishing the death of Mrs. McBeth by violence or by any other means at hand.
We find that the lower court was eminently correct in rejecting suicide as the cause of insured’s death. Mrs. McBeth’s death was covered by the subject policy.
On the question of whether or not the penalty of six (6%) per cent should be assessed, this court concurs in the decision of the trial judge to reject this demand, and, while defendant’s refusal to pay bordered on being unreasonable, it cannot be so held for the reason defendant, we believe, could properly, legally and in good conscience rely on the professional opinion of Dr. Stafford, the coroner, that the deceased’s death was a suicide.
The judgment of the trial court will be affirmed at appellant’s costs.
Judgment affirmed.